UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
DONALD MICHEL,

               Petitioner,

    -against-                             **MEMORANDUM & ORDER**
                                              18-CV-2469 (PKC)

MICHAEL KIRKPATRICK,

               Respondent.

----------------------------------------------------------X
PAMELA K. CHEN, United States District Judge:

      Petitioner Donald Michel, appearing *pro se*, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for Murder in the Second Degree under N.Y. Penal Law § 125.25(3), and Criminal Possession of a Weapon in the Second Degree under N.Y. Penal Law § 265.03(3), and his sentence entered on December 5, 2011 in the Supreme Court of the State of New York, Kings County.  Petitioner challenges his conviction on the following grounds: (1) the verdict sheet and the trial court's supplemental instructions on the felony murder charge were erroneous; and (2) his defense counsel was ineffective in (a) failing to object to the erroneous instructions and verdict sheet, (b) failing to call his sister to testify at the pre-trial suppression hearing, and (c) failing to challenge the police's allegedly illegal search and seizure with respect to his cell phone records.  (*See generally* Dkt. 1.)  For the reasons set forth below, the petition is denied in its entirety.

# BACKGROUND

## I.   Underlying Facts[1]

On the afternoon of December 29, 2008, Sason Shokrany was working in his store in Brooklyn.  (Tr.[2] 1, Dkt. 8-3, at ECF 682: 3–14.)  At approximately 3:30 or 4:00 p.m., Petitioner entered the store and asked Shokrany about a charger for Petitioner's cell phone.  (*Id.* at ECF 682: 6–8; ECF 683:9–13.)  After a brief conversation, Petitioner pulled out a gun and pointed it at Shokrany.  (*Id.* at ECF 688:16–20.)  At the same time, Widley Viau entered the store with a shopping bag, which he and Petitioner began filling with cell phones from the display case.  (*Id.* at ECF 691:18–20.)  Shortly thereafter, Shokrany looked toward the front door of the store, which was glass, and saw Zalmai Anwari, who worked as a driver for the cab company next door, outside the door.  (*Id.* at ECF 696:1–4.)  Shokrany watched as Viau ran out of the store, followed by Petitioner, leaving the blue shopping bag in the store in their haste.  (*See id.* at ECF 696:6–24.)  Shokrany saw two shots fired, hitting Anwari in the head.  (*Id.* at ECF 699:6–11.)  Anwari died the next day from the gunshot wound.  (Tr. 2, Dkt. 8-4, at ECF 814:8–15.)

Petitioner was arrested in his home in Queens and taken to the 61st Precinct on the same day that Anwari died.  (*Id.* at ECF 924–37.)  Shokrany identified Petitioner in a lineup.  (Tr. 1,

---

[1] Because Petitioner has already "been found guilty of the crime[s] charged," the Court construes the facts "in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[2] "Tr." generally refers to the transcript of what occurred before the trial court.  The number immediately following "Tr." refers to the relevant trial transcript section.  More specifically, "Supp. Tr., Dkt. 8-2" refers to the transcript of Petitioner's suppression hearing; "Tr. 1, Dkt. 8-3" refers to the first transcript of Petitioner's trial; "Tr. 2, Dkt. 8-4" refers to the second transcript of Petitioner's trial; and "Tr. 3, Dkt. 8-5" refers to the third and last transcript of Petitioner's trial. The "ECF" page numbers following the transcript identifier refer to the "PageID" number in the upper right corner of the combined transcript generated by the Court's CM/ECF docketing system and not the document's internal pagination.  The numbers following the colon correspond to the line numbering on the left side of each page of the transcript.

Dkt. 8-3, at ECF 704–06.)  While in custody, Petitioner also made statements to police admitting that he had participated in the attempted robbery of the store and that he had brandished a gun while Viau loaded merchandise into a bag.  However, with respect to the killing of Anwari, Petitioner told the police that, as Petitioner and Viau fled from the store, Viau had shot a man.  (Tr. 2, Dkt. 8-4, at ECF 1065:91–1066:9.)  Petitioner was charged, by Kings County Indictment Number 25/2009, with Murder in the First Degree and Murder in the Second Degree, both with robbery as the underlying felony; Manslaughter in the First Degree; and Criminal Possession of a Weapon in the Second Degree.  (Dkt. 8-1, at ECF 78, 174.)

## II.    Suppression Hearing

The trial court held a suppression hearing on September 12 and 15, 2011, at which Petitioner raised a number of issues, including the manner in which he was arrested, and the subsequent lineup and content of his written statements.  (Supp. Tr., Dkt. 8-2, at ECF 370:14–25; ECF 372:1–10.)  Two New York City Police Department ("NYPD") detectives, Detective Lou Yero and Detective James McCafferty, and Kings County Assistant District Attorney ("ADA") John Gianotti testified at the hearing.  (*Id.* at ECF 179:21–22; ECF 265:2–4; ECF 294:8–10.)  The Court found the detectives' testimony credible and the arrest of Petitioner lawful.  (*Id.* at ECF 371:11–12.)  The trial court specifically held both that there was consent for the police to enter Petitioner's home to arrest him and that, in any event, an outstanding warrant for his arrest, unrelated to the homicide charges, justified the officers' entry.  (*Id.* at ECF 371:13–20.)

## III.    Trial

Between September 28, 2011 and October 13, 2011, a jury trial was held before Justice Joel M. Goldberg in Kings County Supreme Court.  (*See generally* Trs. 1–3, Dkts. 8-3, 8-4, 8-5.)  In addition to Shokrany's testimony about the attempted robbery by Petitioner and Viau, and Petitioner's shooting of Anwari (Tr. 1, Dkt. 8-3, at ECF 683–700), a number of law enforcement

and forensic expert witnesses testified.  Detective Matthew Steiner of the NYPD's Crime Scene Unit testified that the blue shopping bag, which was left at Shokrany's store, and all of its contents were forwarded to the police lab for chemical development of latent fingerprints and DNA analysis.  (*Id.* at ECF 579:15–22.)  He also testified that he recovered thirty-four latent fingerprints from the crime scene.  (*Id.* at ECF 604:6–9.)  Alynka Jean of the NYPD Latent Print Development Unit testified that she found four fingerprints on a roll of duct tape, thirteen prints on the cell phones and chargers, and twenty-five fingerprints from the shopping bag itself.  (*Id.* at ECF 638:7–20; ECF 651:21–24; ECF 657:3–23.)  Detective Cynthia Ramirez, also of the Latent Print Unit, testified that she identified one of the fingerprints from the side of a case containing watches inside Shokrany's store, and two fingerprints from a duct tape roll, as belonging to Petitioner.  (Tr. 2, Dkt. 8-4, at ECF 856:2–9, 866:11–20.)  Anthony Joseph Tosi, a criminalist with the New York City Office of the Chief Medical Examiner (the "ME's Office"), stated that the DNA samples taken from the blue shopping bag likely belonged to Viau.  (*Id.* at ECF 909:2–15.)

Dr. Melissa Pasquale-Styles, also with the ME's Office, testified that Anwari's death was caused by a gunshot wound to the head.  (Tr. 2, Dkt. 8-4, at ECF 814:8–15.)  Detective Wilfredo Torres of the NYPD's Firearms Analysis Section testified that he could not determine whether the bullet that killed Anwari was fired from a revolver or a semi-automatic pistol.  (*Id.* at ECF 828:21–24.)

NYPD Detective James McCafferty testified that, on December 31, 2008, upon learning that Petitioner's fingerprints had been found inside the cell phone store, he went to Petitioner's house and asked if Petitioner would speak to the police, and that Petitioner agreed and accompanied McCafferty to the 61st Precinct.  (*Id.* at ECF 925–32.)  ADA Gianotti testified that he conducted a videotaped interview of Petitioner at the 61st Precinct that day.  (*Id.* at ECF 1024:3–

7.)  Detective Yero testified that on December 30, 2008, he conducted lineups for Shokrany to identify the people who attempted to rob the cell phone store.  (*Id.* at ECF 1042:13–16.)  Detective Yero further stated that he read Petitioner his *Miranda*[3] warnings on December 31, 2008, after which Petitioner admitted his role in the robbery, but claimed that Viau had taken the gun from him and run out of the cell phone store.  (*Id.* at ECF 1053–59.)  Petitioner's written statement was provided to the jury.  (*Id.* at ECF 1064–66.)

In addition to these law enforcement witnesses, Joseph Sierra, a compliance officer at T-Mobile, testified that T-Mobile had Viau's name and address in its records.  (Tr. 3, Dkt. 8-5, at ECF 1110:15–21, 1113:9–21.)  Lastly, Henry Enright, a contractor for AT&T, testified that several calls were made to and from Petitioner's cell phone around the date and time of the attempted robbery, indicating that he was in the vicinity of Shokrany's cell phone store around the date and time at issue.  (*Id.* at ECF 1154–58.)

Following the presentation of evidence and summations, the trial court charged the jury.  (*Id.* at ECF 1259–99.)  Before the jury began its deliberations, the court told the jury that it would be receiving an annotated verdict sheet.  (*Id.* at ECF 1293:19–25.)  In introducing the annotation for the first charge, Murder in the First-Degree, the court stated:

> And just a reminder under there, I've written, intentionally and personally causes the death while committing a robbery.  That's not the entire definition but it's just to differentiate it from the other charges.  So murder in the first degree requires that the defendant personally caused someone's death, that he did it during the commission of a robbery, and that he was at least eighteen years old at the time.  I summarized some of those elements here for you.

(*Id.* at ECF 1294:2–12.)  When explaining the annotation for the Murder in the Second-Degree charge, the court said, "[a]nd count three is murder in the second degree with a reminder under it,

---

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

causes death either personally or acting in concert while committing a robbery." (*Id.* at ECF 1294:22–24.) Defense counsel did not object to the court's oral explanation of the annotated verdict sheet. (*See generally* Tr. 3, Dkt. 8-5.)

During deliberations, the jury sent the court several notes. (*See, e.g.*, *id.* at ECF 1316:4–5.) One of the notes, marked Court Exhibit 8, asked for "[specific] instructions on how to fill out the verdict sheet." (*Id.* at ECF 1316:14–19.) Another note, marked Court Exhibit 9, read, "[c]an the jury get explained the four charges that is [sic] on the verdict sheet." (*Id.* at ECF 1316:24–25, ECF 1317:1–2.) The court stated to the jury:

> Now, I will give you an overall explanation of the charges. I'm not going to give you a detailed explanation of the charges. If you want a detailed explanation of the charges I will. If you understand this overall view you will understand why the verdict sheet instructions are the way they are.

(*Id.* at ECF 1319:4–10.) When describing count three, the felony-murder charge (or second-degree murder charge) on which Petitioner was ultimately convicted, the court stated:

> [C]ount three is the deceased was killed during the course of and in furtherance of the commission of a robbery or an immediate flight therefrom of a robbery, that the defendant was a participate [sic] in the robbery. . . . As long as the defendant was a participant in the robbery, the death was caused in the course of commission or immediate flight of the robbery by one of the participants in the robbery, either with intent of doing something else and the deceased is not a participate [sic] in the robbery, that's the felony murder that I think I talked to you about during jury selection.

(*Id.* at ECF 1320:13–25, 1321:1–3.) The court, in its concluding statements to the jury, said that if the jury had "any specific questions on any of the charges one at a time, you want me to read you the whole definition of any of the charges, just let me know. But I figured rather than read you the specific definitions of all the charges, I'll give you an overview." (*Id.* at ECF 1321:19–23.) Petitioner's defense counsel did not object to the court's response to the jury's notes or request that the court give additional instructions. (*See generally* Tr. 3, Dkt. 8-5.)

On October 13, 2011, the jury found Petitioner guilty of Murder in the Second-Degree (count three) and Criminal Possession of a Weapon in the Second-Degree (count four).  (*Id.* at ECF 1355: 20–24, 1355:25, 1356:1–4.)  On December 5, 2011, the trial court sentenced Petitioner to a prison term of twenty-five years to life on the murder conviction, and seven years, plus five years post-release supervision, for the Criminal Possession of a Weapon in the Second-Degree conviction, to run consecutively.  (*Id.* at ECF 1381:10–21.)

## IV.    Direct Appeal

Petitioner appealed his convictions to the New York State Appellate Division, Second Department, raising two issues in his counseled brief: (1) the trial court's supplemental felony murder charge and annotated verdict sheet were erroneous and denied him his right to a fair trial; and (2) the trial court improperly imposed consecutive sentences on the murder and weapon possession convictions.  (Dkt. 8-1, at ECF 82, 93.)  Additionally, in a *pro se* supplemental brief, Petitioner argued that his counsel was ineffective for failing to call critical fact witnesses.  (*Id.* at ECF 139.)  On November 16, 2016, the Appellate Division affirmed and modified Petitioner's judgment of conviction.  *People v. Michel*, 41 N.Y.S.3d 112 (App. Div. 2016).  The court held that Petitioner's contention regarding the Supreme Court's supplemental instructions was both unpreserved for appellate review and without merit, and that counsel was not ineffective for failing to object to the supplemental instructions.  *Id.* at 949.  The Appellate Division also decided that the imposition of consecutive sentences was improper and modified the judgment accordingly.  *Id.* (re-sentencing Petitioner to serve concurrent sentences).  The Appellate Division did not address Petitioner's *pro se* ineffective assistance of counsel claim with respect to the failure to call critical witnesses.  *Id.*  The New York Court of Appeals denied Petitioner's leave to appeal on January 11, 2017.  *People v. Michel*, 28 N.Y.3d 1148 (2017).

## V.      Subsequent Motions and the Instant Petition

Petitioner timely filed the instant petition on April 10, 2018.  (Dkt. 1.)[4]  Respondent submitted an affidavit in opposition to the petition on August 22, 2018.  (Dkt. 8.)  Despite suggesting, as discussed below, that he has filed a motion to vacate the judgment of conviction under N.Y. Crim. Proc. Law § 440.10 ("Section 440 Motion") and/or a motion for a writ of error *coram nobis*, Petitioner has not served either on the Kings County District Attorney's Office.

On September 7, 2018, Petitioner filed a letter seeking additional time to exhaust his remedies in state court (Dkt. 9), which the Court granted on September 14, 2018 (*see* Sept. 14, 2018 Order).  On November 29, 2018, Petitioner asked for an additional ninety days.  (Dkt. 10.) The Court granted Petitioner's request to stay the case for an additional ninety days, noting that

> [n]otwithstanding the continuation of the stay for another 90 days, Petitioner is advised that the Court has the authority to decide his petition even before he has fully exhausted all of his claims.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Petitioner is advised that the Court will likely direct him to file any reply relating to his pending habeas petition within 30 days after the 90-day extension has expired.

---

[4] The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on petitions seeking habeas relief from a state court judgment.  28 U.S.C. § 2244(d)(1).  The one-year period runs from the date on which one of the following four events occurs, whichever is latest: (1) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (2) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action; (3) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)(A)–(D).  A judgment of conviction becomes "final" within the meaning of 28 U.S.C. § 2244(d)(1)(A) upon completion of a defendant's direct appeal in the state's highest court and either (a) completion of proceedings before the United States Supreme Court if the petitioner chooses to file for a *writ of certiorari*, or (2) the expiration of time to file such a writ.  *Williams v. Artuz*, 237 F.3d 147, 150–51 (2d Cir. 2001).  This petition was filed on April 10, 2018 (*see* Dkt. 1), and is thus timely.

(Dec. 10, 2018 Order.)  On March 13, 2019, Petitioner wrote to the Court and advised that he could not provide his motions for a writ of error *coram nobis* and Section 440 Motion due to conditions at his current facility.  (Dkt. 11.)  On March 22, 2019, the Court ordered that, *inter alia*,

> Petitioner is advised that while the Court understands that Petitioner may be experiencing difficulties in filing his writ of *coram nobis* application and/or his reply in this matter, the Court is lifting the stay imposed at Petitioner's request on December 10, 2018.  Petitioner therefore must file his reply, if any, to Respondent Kirkpatrick's August 2018 Response to the Show Cause Order by **May 3, 2019**.  Petitioner is further advised that even if he has not exhausted his state remedies or filed a reply by that date, the Court may nonetheless rule on his pending habeas petition.

(Mar. 22, 2019 Order.)

To date, Petitioner has not served Respondent or provided the Court with copies of any writ of *coram nobis* petition or Section 440 motion, nor has he submitted a reply to the Response to Show Cause Order or any other filings relating to this federal habeas petition.  However, given that eighteen months have passed since the Court's March 22, 2019 order regarding these filings, the Court proceeds to address each of Petitioner's stated claims for relief, notwithstanding his failure to exhaust all of them.  (*See* Apr. 10, 2018 Letter from Petitioner, Dkt. 1-1.)

## STANDARD OF REVIEW

Section 2254 provides that a habeas corpus application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment."  *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks and citation omitted).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks and citation omitted). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" Supreme Court cases, or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (citation omitted).

A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* (citation omitted). The AEDPA, 28 U.S.C. § 2254, establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## DISCUSSION

Petitioner challenges his conviction on many of the same grounds that formed the basis of his appeal: (1) the verdict sheet and the trial court's supplemental instructions on the felony murder charge were erroneous; and (2) defense counsel was ineffective in (a) failing to object to the erroneous instructions and verdict sheet; (b) failing to call his sister to testify at the pre-trial

suppression hearing; and (c) failing to challenge the search and seizure of his cell phone records. The Court denies Petitioner's claims regarding the trial court's supplemental jury instructions and verdict sheet as procedurally barred, and in any event, as meritless, and finds that Petitioner's ineffective assistance of counsel claims similarly fail on their merits.

## I.      Trial Court's Supplemental Jury Instructions

Petitioner's claim that the trial court's supplemental jury instructions on second-degree murder were erroneous is procedurally barred and, in any event, fails on the merits.  Federal courts are precluded from "review[ing] questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'"  *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  A state law is considered "independent" when a state court relied on a procedural bar as an "independent basis for its disposition of the case."  *Parks v. Sheahan*, 104 F. Supp. 3d 271, 281 (E.D.N.Y. 2015) (internal citation omitted).  Further, a state law is considered "adequate" when it is determined that the law is "'firmly established and regularly followed' by the state in question."  *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)).  When a state court decision rested on both independent and adequate state grounds, the claim is beyond the reach of federal habeas corpus review, unless the petitioner can establish either a showing of cause and prejudice for the procedural default or that failure to consider the claim would result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750; *see also Davidson v. Cunningham*, No. 16-CV-1125 (JFB), 2017 WL 3738560, at *7 (E.D.N.Y. Aug. 29, 2017); *Brunson v. Tracy*, 378 F. Supp. 2d 100, 106 (E.D.N.Y. 2005).

Here, Petitioner's argument regarding the deficiencies in the trial court's supplemental jury charges is procedurally barred because Petitioner failed to preserve it by raising a

contemporaneous objection at trial.  As the New York Court of Appeals has denied leave to appeal without explanation, the decision of the Appellate Division stands as the last judgment on the state law ground for the rejection of this claim.  The Appellate Division's ruling that Petitioner's argument regarding the trial court's supplemental jury instructions was "unpreserved for appellate review" relied on New York's contemporaneous objection rule, N.Y. Crim. Proc. Law ("C.P.L.") § 470.05(2).  *See Michel*, 144 A.D.3d at 949.  Section 470.05(2) provides that a party seeking to preserve a claim of error during a trial or proceeding must protest "at the time of such ruling . . . or at any subsequent time when the [trial] court had an opportunity of effectively changing the same."  *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (finding New York courts interpret C.P.L. § 470.05(2) to require that a party seeking to preserve an issue bring the issue to the trial court's attention at the time of the alleged error so that the court has an opportunity to remedy it) (citing *People v. Luperon*, 647 N.E.2d 1243, 1247 (N.Y. 1995)).  It is well-established that the contemporaneous objection rule is a state law ground independent of any federal constitutional question.  *See Downs v. Lape*, 657 F.3d 97, 103 (2d Cir. 2011) ("[W]e have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule . . . we have also held . . . that the contemporaneous objection rule constitutes an independent and adequate state law ground for disposing of a claim." (internal citations omitted)).  In addition, the Appellate Division's explicit invocation of the procedural bar constitutes an "independent" state ground.  *See Harris v. Reed*, 489 U.S. 255, 263 (1989).  The contemporaneous objection rule has also consistently been recognized as a "firmly established and regularly followed" rule among New York courts, and is therefore adequate to support the Appellate Division's decision.  *See, e.g.*, *Davidson*, 2017 WL 3738560, at *8; *Santiago v. Miller*, No. 01-CV-3256 (JBW), 2003 WL 22284173, at *13 (E.D.N.Y. Aug. 20, 2003) ("New York State's

contemporaneous objection rule is an adequate and independent state ground for decision." (citation omitted)).  New York courts regularly apply this rule to claims of jury instruction error.  *See, e.g.*, *People v. Keschner*, 37 N.E.3d 690, 721–22 (N.Y. 2015).  Furthermore, the Appellate Division's decision to rule on the merits does not remove the procedural bar to this claim.  *See Jamison v. Auburn Corr. Facility*, No. 10-CV-3440 (MKB), 2015 WL 8770079, at *7 (E.D.N.Y. Dec. 14, 2015).  Accordingly, the Appellate Division's reliance on C.P.L. § 470.05(2), as an independent and adequate state law ground to dismiss Petitioner's claim regarding the trial court's supplemental jury charges, bars this Court from conducting federal habeas review of that claim.

However, a procedurally barred claim may be subject to federal habeas relief upon a showing of cause for the procedural default and either resulting prejudice or a fundamental miscarriage of justice will result in denying habeas relief.  *Harris*, 489 U.S. at 262; *Parks v. Sheahan*, 104 F. Supp. 3d 271, 282 (E.D.N.Y. 2015).  Cause for the procedural default is established by showing that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Copeland v. Walker*, 258 F. Supp. 2d 105, 130 (E.D.N.Y. 2003) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Prejudice resulting from the federal habeas court's refusal to review a claim requires a "reasonable probability" that the outcome of the trial would have been different but for the alleged constitutional violation.  *Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 367 (E.D.N.Y. 2013) (quoting *Strickler v. Greene*, 527 U.S. 263, 289 (1999)).  In the alternative, a fundamental miscarriage of justice occurs only in extraordinary cases, such as where a constitutional violation results in convicting a person who is actually innocent.  *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002); *Edwards*, 991 F. Supp. 2d at 367.

13

Here, the only cause suggested by Petitioner is the ineffectiveness of his trial counsel for failing to object to the supplemental jury instructions.  Ineffective assistance of counsel claims, in certain circumstances, can constitute cause to excuse a procedural default.  *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).  But here, as addressed *infra*, Petitioner's counsel was not ineffective for failing to object to the trial court's supplemental jury instructions.  Because Petitioner cannot satisfy the cause and prejudice standard for an ineffective assistance of counsel claim, trial counsel's alleged ineffectiveness cannot serve as cause to excuse the procedural default with respect to Petitioner's erroneous supplemental jury instructions claim.  *See id.*  In addition, there is nothing in the record to suggest that prejudice or a fundamental miscarriage of justice would result if this petition is denied.  Accordingly, Petitioner's claim does not overcome the procedural bar with respect to his claim regarding the trial court's supplementation of the jury instructions.

While the Appellate Division held that Petitioner's claim was unpreserved, it also found that Petitioner's claim of erroneous supplemental jury instructions was without merit because the trial court responded meaningfully to the jury's request regarding those instructions.  *Michel*, 144 A.D.3d at 949.  The Court adopts that reasoning and further finds that Petitioner's claim fails on the merits because the trial court's decision was not contrary to, nor did it involve, an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d); *accord Middleton v. McNeil*, 541 U.S. 433, 437–38 (2004) (internal quotation marks, citations, and alterations omitted).

The trial court's original instructions to the jury regarding the murder charge are not in dispute.  When the court delivered its supplemental instructions to the jury, it explained that it would give the jury an "overall explanation of the charges," but that it would not, at that time, give a "detailed explanation of the charges."  (Tr. 3, Dkt. 8-5, at ECF 1319:4–6.)  The court informed the jury that the purpose of its explanation was to help the jury understand how to use the verdict

14

sheet. (*Id.* at ECF 1319:8–10.)  In delivering the supplemental instructions, the trial court correctly

instructed the jury with respect to the felony murder charge on which Petitioner was ultimately

convicted.  (*See id.* at ECF 1320:13–25, 1321:1–3.)  In an attempt to further clarify the charge, the

court omitted the element requiring that Anwari's death be caused in furtherance of the underlying

felony or flight therefrom.

> The trial court, required under C.P.L. [§] 310.30 to give such requested information
> or instruction as the court deems proper, is vested with some measure of discretion
> in framing its response and is in the best position to evaluate the jury's request in
> the first instance.  But that discretion is circumscribed, as under the prior code
> provision, by the requirement that the court respond meaningfully to the jury's
> request for further instruction or information[.]

*People v. Malloy*, 55 N.Y.2d 296, 302 (1982) (internal quotation marks omitted).  The purported

omission, viewed in the context of the overall charge, is consistent with the trial court's duties, and

certainly does not rise to the level of a constitutional violation.  *Cf. Middleton*, 541 U.S. at 437–

38.  Prior to this omission, the trial court had twice correctly instructed the jury on the felony

murder charge.  The court made clear to the jurors that it was not comprehensively instructing

them as to the elements of the charges, but rather on how to use the verdict sheet.  The court also

instructed the jury, "[i]f you have any specific questions on any of the charges one at a time, you

want me to read you the whole definition of any of the charges, just let me know."  (Tr. 3, Dkt. 8-

3, at ECF 1321:19–21).  Jurors are presumed to follow the instructions that they are given.

*Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  The jury's decision not to request further

clarification indicates that they understood the definition of the charges as had been explained by

the court.  The trial court's supplemental instructions were both meaningful and within the court's

discretion.

However, even assuming *arguendo* that the omission did constitute a Due Process

violation, habeas petitioners are not entitled to relief based on a trial error unless they can establish

that it resulted in actual prejudice. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Given the weight of the evidence against Petitioner, as previously described, the Court finds that there is no reasonable possibility that a prejudicial error occurred. *See Orlando v. Nassau Cnty. Dist. Att'y's Off.*, 915 F.3d 113, 127 (2d Cir. 2019) (citing, *inter alia*, *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

## II.     Verdict Sheet Claim

Petitioner's claim that the verdict sheet contained language not authorized by C.P.L. § 310.20 fails for many of the same reasons that his claim regarding the jury instructions fails. More specifically, it is strictly a state law claim and thus not amenable to federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Anderson v. Keane*, 283 F. Supp. 2d 936, 942 (S.D.N.Y. 2003); *see also Porter v. Martuscello*, No. 16-CV-1417 (WHP) (HBP), 2018 WL 8895807, at *11 (S.D.N.Y. Aug. 10, 2018) ("Jury instructions are ordinarily matters of state law, and in order for an alleged defect in a jury instruction to rise to the level of a constitutional violation it must not only violate state law, it must also violate a right guaranteed to the defendant by federal law.") (internal citations omitted)), *report and recommendation adopted* 2019 WL 2537415 (S.D.N.Y. Jun. 20, 2019). Because Petitioner neither alleges nor demonstrates any federal right that was violated by use of the annotated verdict sheet at his trial, this claim is denied. *Porter*, 2018 WL 8895807, at *11 (denying petitioner's jury charge and verdict sheet claim because "[a]part from his invocation of the general right to a fair trial, [petitioner] does not identify any federal right that was allegedly violated by the Trial Court's jury instructions and the use of the verdict sheet[,] . . . [and petitioner]'s complaints concerning the jury instructions are really state law claims").

### III.    Ineffective Assistance of Trial Counsel

Petitioner makes three distinct ineffective assistance of trial counsel claims: (1) trial counsel was ineffective for failing to object to the court's supplemental jury instructions and the verdict sheet; (2) trial counsel was ineffective for not calling Petitioner's sister to testify at the suppression hearing; and (3) trial counsel was ineffective for not arguing that Petitioner's cell phone records had been illegally seized.  For the reasons below, the Court finds that all three claims lack merit.

"The Supreme Court in *Strickland* set forth a two-part test for evaluating claims of ineffective assistance of counsel.  To warrant relief, a defendant must demonstrate both 'that counsel's performance was deficient' and 'that the deficient performance prejudiced the defense.'"  *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  "Under *Strickland*'s first prong, counsel's conduct falls to the level of being deficient if 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'"  *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) (quoting *Strickland*, 466 U.S. at 687).  Under the second prong, a counsel's conduct prejudiced the defense if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 123 (quoting *Strickland*, 466 U.S. at 688, 694).

"To prevail [on an ineffective assistance claim], a defendant must establish both of S*trickland*'s prongs because, otherwise, 'it could not be said that the sentence or conviction resulted from a breakdown in the adversary process that rendered the result of the process unreliable, and the sentence or conviction should stand.'"  *Id.* (quoting *Bell v. Cone*, 535 U.S. 685, 695 (2002)).  Furthermore, "[o]ur scrutiny of counsel's performance must be 'highly deferential' because we must apply 'a strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance.'" *Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015) (quoting *Strickland*, 466 U.S. at 689).

> **A.     Trial Counsel's Failure to Object to the Supplemental Jury Instructions and Verdict Sheet Was Not Ineffective**

Because the Appellate Division decided Petitioner's ineffective assistance claim, relating to trial counsel's failure to object to the supplemental instructions and verdict sheet, on the merits, Petitioner must show that in doing so, the Appellate Division unreasonably applied *Strickland*. Petitioner has failed to make the requisite showing.

Petitioner's claims regarding the trial court's supplemental instructions and verdict sheet satisfy neither prong of the *Strickland* test.  As discussed above and in the Appellate Division's decision, the trial court's supplemental instructions were meaningful and proper.  As such, any objection to these instructions would likely have been denied, and an attorney cannot "have been ineffective for failing to make a motion that would have been futile."  *United States v. Abad*, 514 F.3d 271, 276 (2d Cir. 2008).  Furthermore, to show prejudice of the magnitude needed to support an ineffective assistance of counsel claim, Petitioner must show a reasonable probability that but for the failure to object, the jury would not have convicted him on some count on which it found him guilty.  *Bennett v. United States*, 663 F.3d 71, 88 (2d Cir. 2011).  Petitioner has made no such showing.  Indeed, he has failed to show how the trial court's supplemental instructions and the verdict sheet misstated the law or led to his erroneous conviction on any count.[5]  The evidence against him, which included his fingerprints at the scene of the crime, eyewitness testimony, and

---

[5] As previously discussed, at most, Petitioner points to the fact that during one of three times that the trial court explained the second-degree murder charge to the jury, the court omitted the element of causing death.  But, as the Court has already found, this omission, when viewed in the context of the jury instructions and the trial, did not result in any prejudice to Petitioner.

a confession to his role in the underlying felony, including brandishing the firearm that was used

to kill Anwari moments later, was overwhelming.

### B. Trial Counsel's Decisions Not to Call Petitioner's Sister to Testify at the Suppression Hearing and Not to Challenge the Arrest Warrant Were Not Ineffective

Petitioner further asserts that had his trial counsel called his sister to testify at the

suppression hearing, she would have testified that the officers lacked consent to enter Petitioner's

home and arrest him.  (Petition, Dkt. 1, at ECF 12–14.)  Petitioner, however, cannot show that he

was prejudiced by the failure to call his sister as a witness for this purpose, because, regardless of

his sister's purported testimony, the police had a valid arrest warrant for Petitioner (*see* Supp. Tr.,

Dkt. 8-2, at ECF 371:13–20), and thus were statutorily permitted to enter the premises to arrest

him, C.P.L. §§ 120.80, 690.50.  Any testimony that the sister did not consent to the police entering

the residence, no matter how compelling, could not have influenced the trial court's decision

finding Petitioner's arrest lawful.  Furthermore, there was no legal basis for Petitioner's attorney

to argue that the sister's purported lack of consent was a bar to the officers' entry into the residence,

given their possession of a valid arrest warrant.  Therefore, the alleged failure of Petitioner's

counsel to call Petitioner's sister as a suppression hearing witness was neither ineffective nor

prejudicial.  *See Esteban-Gomez v. United States*, No. 08-CV-4319 (SJF), 2011 WL 3298219, at

*4 (E.D.N.Y. July 27, 2011) ("Counsel cannot not be deemed ineffective for failing to take an

action where . . . the action 'would have been futile.'" (quoting *Savinon v. Mazucca*, 318 F. App'x

41, 44 (2d Cir. 2009) (summary order)); *see also Abad*, 514 F.3d at 276.

Petitioner also claims that his counsel was ineffective for failing to argue that the warrant

constituted an insufficient basis for his arrest.  (Petition, Dkt. 1, at ECF 14–15.)  The Court rejects

this argument because Petitioner has failed to demonstrate any legal insufficiency with the warrant

or prejudice based on his attorney's failure to challenge the warrant. Petitioner was arrested pursuant to a valid Summons All Purpose ("SAP") warrant (*see* Supp. Tr., Dkt. 8-2, at ECF 193:9–19), the type of warrant issued when a defendant fails to appear in court in response to a summons, *see People v. Irons*, 20 Misc.3d 1127(A) (N.Y. Crim. Ct. July 18, 2008). Even though the summons may have related to a less serious, unrelated event, "there is 'no constitutional significance' to a police officer's use of a minor violation as a pretext for an arrest, in order to obtain evidence of a more serious crime[.]" *Jenkins v. Lee*, No. 11-CV-6806 (PAE) (DF), 2014 WL 5861987, at *25 (S.D.N.Y. Nov. 12, 2014) (quoting *Whren v. United States*, 517 U.S. 806, 815–19 (1996)). Thus, Petitioner has failed to demonstrate "how [his] counsel could have used the circumstances of [his] arrest to fashion a successful Fourth Amendment challenge either to the arrest itself or to Petitioner's subsequent interrogation [post-*Miranda*] and prosecution," *Id.* (citation omitted), and cannot satisfy either prong of *Strickland*, i.e., that his attorney's performance was deficient or that the outcome would have been different.

Accordingly, the Court denies habeas relief based on his attorney's failure to either call his sister as a witness at the suppression hearing or to object to the arrest warrant that gave police the authority to enter Petitioner's home at the time of his arrest on December 30, 2008.

**C.      Trial Counsel's Failure to Object to the Admission of Petitioner's Cell Phone Records Was Not Ineffective**

Lastly, Petitioner claims that his counsel was ineffective for not arguing that the evidence relating to his cell phone records had been illegally obtained and should be suppressed. (Petition, Dkt. 1, at ECF 16.) Petitioner relies, in part, on recent developments in the law regarding cell site data collection. Although this claim is unexhausted, this Court still has the authority to deny it on the merits, *see* 28 U.S.C. § 2254(b)(2), and does so, finding that Petitioner's arguments are meritless.

At trial, the court admitted Petitioner's cell phone records, which included cell site data pinpointing Petitioner's location at critical points during the events of December 29, 2008.  (Tr. 3, Dkt. 8-5, at ECF 1119–25.)  The United States Supreme Court has described this type of evidence as follows:

> There are 396 million cell phone service accounts in the United States—for a Nation of 326 million people.  Cell phones perform their wide and growing variety of functions by connecting to a set of radio antennas called "cell sites."  Although cell sites are usually mounted on a tower, they can also be found on light posts, flagpoles, church steeples, or the sides of buildings.  Cell sites typically have several directional antennas that divide the covered area into sectors.

> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site.  Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features.  Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI).  The precision of this information depends on the size of the geographic area covered by the cell site.  The greater the concentration of cell sites, the smaller the coverage area.  As data usage from cell phones has increased, wireless carriers have installed more cell sites to handle the traffic.  That has led to increasingly compact coverage areas, especially in urban areas.

> Wireless carriers collect and store CSLI for their own business purposes, including finding weak spots in their network and applying "roaming" charges when another carrier routes data through their cell sites.  In addition, wireless carriers often sell aggregated location records to data brokers, without individual identifying information of the sort at issue here.  While carriers have long retained CSLI for the start and end of incoming calls, in recent years phone companies have also collected location information from the transmission of text messages and routine data connections.  Accordingly, modern cell phones generate increasingly vast amounts of increasingly precise CSLI.

*Carpenter v. United States*, 138 S. Ct. 2206, 2211–12 (2018).  In *Carpenter*, the Court considered the Fourth Amendment implications of this type of evidence-gathering by the police—through which, given developing technology, the "suspect . . . has effectively been tailed every moment of every day"—ultimately concluding that the government must use a search warrant to obtain this type of information.  *Id.* at 2218, 2221.  It is undisputed that in this case there was no such warrant,

nor did Petitioner's trial counsel argue that the prosecution should have obtained one.  However, Petitioner's criminal case was tried in December 2011, almost seven years before the Supreme Court's decision in *Carpenter*, prior to which law enforcement officers were not legally required to obtain a search warrant for cell site data.  Petitioner's trial counsel cannot be expected to have anticipated this change in the law many years later, and courts must "be watchful to eliminate the distorting effects of hindsight."  *Browne v. Greene*, 577 F.3d 107, 110, 113 (2d Cir. 2009) (internal quotation marks and citation omitted).  In *Carpenter*, the Court explicitly noted that the question it confronted, in 2018, was a "new phenomenon" that had not yet been decided.  138 S. Ct. at 2216.  As such, the Court finds that trial counsel's failure to object in 2011 to the prosecution's use of cell site data that was obtained without a search warrant, at a time when none was required, did not render the assistance Petitioner received ineffective.

Moreover, even had this evidence been suppressed, there was no shortage of uncontested evidence supporting the jury verdict, including Petitioner's own admissions (*inter alia*, placing himself at the robbery with a gun), Petitioner's fingerprints at the scene of the crime, and eyewitness testimony.  Thus, Plaintiff cannot demonstrate prejudice from his counsel's failure to object to the admission of the cell site data evidence at trial.  *Strickland*, 466 U.S. at 693 ("[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice.").  The Court therefore denies habeas relief on Petitioner's claim of ineffective assistance with respect to the prosecution's use of his cell phone records.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, is denied.  Petitioner is denied a certificate of appealability, as he has failed to make

a "substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2); *see*

*Middleton v. Att'ys Gen.*, 396 F.3d 207, 209 (2d Cir. 2005) (denying certificate of appealability

where petitioner has not shown that "reasonable jurists could debate whether the petition should

have been resolved in a different manner or that the issues presented were adequate to deserve

encouragement to proceed further" (internal quotation marks and citation omitted)).   Additionally,

the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not

be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal.

*Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).   The Clerk of Court is therefore

respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 29, 2020
　　　　Brooklyn, New York

23